WESTMONT NATIONAL BANK, APPELLANT, v. CLARA PAYNE, RESPONDENT.

WESTMONT NATIONAL BANK, APPELLANT, v. JAMES PAYNE, RESPONDENT.

Submitted February 13, 1931—Decided October 19, 1931.

134

For the appellant, *Walter S. Keown*.

For the respondent, *Boyle & Archer* (*William T. Boyle*, of counsel).

The opinion of the court was delivered by

DALY, J. These two separate suits, one by Westmont National Bank against Clara Payne, and the other by the same plaintiff against James Payne, were tried together in the Camden County Circuit Court. The suits were based upon notes, both bearing the same date, November 30th, 1928, each for $6,000, and made payable each to the order of Westmont National Bank, on demand. It is conceded that the facts in each case are in substance the same. The jury rendered verdicts in favor of each of the defendants, and from the two judgments on the verdicts the plaintiff appeals.

Harold Kirkbride was the cashier of the Westmont National Bank. For ten years he and the Paynes had been friends. The Paynes were a rather elderly couple, living in very modest circumstances and, judged by their testimony, were persons of but little, if any, business experience. Kirkbride, who frequently visited this couple, called on them on Sunday, January 27th, 1929, and, as testified to by the Paynes, obtained their signatures to two pieces of paper which were blank to them. When, at the trial, Mrs. Payne was asked how her signature was obtained she answered, "why, Mr. Krkbride come in our house on a Sunday night, on the 27th of January, and he sat down a few minutes and he asked Mr. Payne—he always called him 'Dad'—he said, 'Dad, I want you to do me a favor,' and Mr. Payne says, 'I told you, Harry, anything will be in my power, I would do for you,' and he put his hand in his pocket and pulled out this paper, and before Mr. Payne signed it, he says, 'Harry, will this hurt our home or take anything from us?' He says, 'no, not whatsoever, harm either one of you,' and that was all." She further testified the paper was "folded up" and "there was nothing on it to read;" that she did not know that she was signing a note, and that nothing was said at the time about a note or about the Westmont bank. She further asserted she never owned any stock in any Brown Tube Company and there was no discussion about such stock.

The testimony of the husband, James Payne, was essentially the same as that of Mrs. Payne, he adding that when Kirkbride asked him if he would do him, Kirkbride, a favor, his answer was "yes, if I could ever do him a personal favor, because he done me one once when I was out of work." Payne also testified that he was just given "a piece of paper to sign," and that nothing was said about a note, or the Westmont bank, and there was not anything said about $6,000, or $12,000 or about any money.

Joseph B. Allen, an uncle to Mrs. Payne, who lived with the Paynes, testified he was present at the signing, that it was done on a Sunday night.

Harold Kirkbride testified that the notes were signed on

a Sunday, "either the latter part of January or early in February," of the year 1929, and that the notes were not filled out at the time when they were signed.

On or about April 12th, 1929, an auditing committee of the board of directors of the bank, making an examination of the bank's securities, discovered in the note file or box of the bank, seventeen promissory notes, aggregating $97,500, and included in these seventeen were the two sued upon in these cases. The pieces of paper to which the Paynes had attached their signatures on Sunday, January 27th, 1929, and which were believed by them to be blank pieces of paper, according to their testimony, were actually blank forms of collateral notes. These forms, with the signatures at the bottom of each, had been filled out by Kirkbride by dating them as of November 30th, 1928, and making them promissory notes for $6,000 each, payable on demand, to the order of the Westmont National Bank, and, further by asserting in each of the notes that the signer thereof had deposited as collateral security for the payment thereof "four hundred shares Brown Tube—cash value $7,000." Accompanying each of these notes were five certificates, each certifying that Harold Kirkbride was the owner of one hundred shares of the capital stock of Brown Tube Corporation. Neither of the Paynes ever owned stock in this corporation, and neither of them had an account in the Westmont National Bank.

Kirkbride had for a long time been the cashier and in charge of the operations of the bank. He had authority to approve loans up to $200; notes beyond that amount were to be passed upon by the board of directors. The seventeen notes, aggregating $97,500, bearing different dates from October 30th, 1928, to December 31st, 1928, and all of which were largely over the cashier's limit of $200, had never been presented to the board of directors—they knew nothing about them until after the audit of April 12th, 1929. Every note found, excepting the seventeen, were recorded in the discount register and in the minutes of the meetings of the directors. The note box in which they were found had been in the control of Kirkbride; and the book known as the general journal

or daily settlement book, which was supposed to contain the transactions that occurred on each day, had been in the direct charge and custody of Kirkbride, and it was he who made the entries therein. In this book there were found on various dates from October 30th, 1928, to December 31st, 1928, entries purporting to show that notes had been discounted, without giving any names as to whom the notes were discounted for, the only record being the word "Dem," meaning a demand loan. On the same day such entries were made there had to be off-set entries, in order for the books to be in balance, and these off-set entries were drafts which were used to purchase stock in Brown Tube Corporation. Kirkbride was taking the bank's money to speculate in this stock, and he was using this method to cover his embezzlements.

While the daily settlement book kept by Kirkbride shows these entries of unidentified demand notes, there is no evidence whether these entries, at the time they were made, were mere bookkeeping entries, or whether he actually had notes in his possession, or in the bank's note box, to account for these entries. The date on each of the Payne notes is November 30th, 1928, and there is no unidentified entry on that date in the daily settlement book. So he did not use these notes on their date to aid him in stealing from his bank. Kirkbride, who testified that these Payne notes were not filled out at the time they were signed; that he asked for the signatures to assist him in "a little business transaction," and that the signatures were not obtained until a Sunday in the latter part of January, 1929, or early in February of that year, asserted on the witness stand, that he did not use these notes to balance the daily settlement book, after he did get the signatures, until several days before he "left the bank"—and he left the bank about the time the examination was to be made on April 12th, 1929.

The first count in each of the plaintiffs' complaints charged the defendant in the complaint with "fraudulently obtaining in conspiracy with Harold W. Kirkbride and others the sum of $6,000 and did execute a promissory note to the plaintiff to enable Kirkbride and others and defendant to

obtain the said $6,000 without the consent or knowledge of any of the other officials of the said plaintiff or at the consent or knowledge of the board of directors of the plaintiff." After making this charge against this elderly couple the bank did not offer a single atom of evidence to prove it; and, upon the conclusion of the plaintiff's case, the plaintiff was nonsuited on the first count, the count charging conspiracy in each complaint, and this was done after the plaintiff, itself, wanted to strike out its first count. Each of the defendants pleaded (a) there was no delivery or consideration; (b) the note was signed through fraud and misrepresentation of the plaintiff's cashier in that the cashier so folded the alleged note that the defendant could not read it, and in that the cashier assured the defendant that the signing of the paper would put no obligation on the defendant; (c) the alleged promissory note is unenforceable and void by the statute, in that the purported note was executed and signed on Sunday, the 27th day of January, 1929.

The appellant divides his brief of seventy-two pages in five parts. Part I challenges the admission of evidence in behalf of the defendants. The contention is made that Kirkbride's testimony should not have been admitted because he was acting without the scope of his authority; that the notes were secured for his own personal benefit and (as plaintiff claims) were the means by which he concealed his shortage and defrauded the bank; further, that his evidence was in violation of the parol evidence rule which forbids parol evidence to be introduced to alter, vary or change a written instrument.

There was no exception taken at the trial to Kirkbride's testimony and exception cannot now be properly taken. However, his testimony was competent and material. Kirkbride's evidence relates to the way in which he secured the notes and how and when he used them, and tends to show not only fraud but an utter failure of consideration. The Paynes got nothing; and the use of the notes by Kirkbride proved an abortive means of covering his shortage. Fraud, misrepresentation and lack of consideration were specifically

set up in defense. Admitting that Kirkbride obtained the signatures for his own benefit and purposes, this did not preclude the exercise of the right of these defendants demanding from Kirkbride, on the witness stand, admissions of the facts as to how, when and where they were duped by him. Certainly, the parol evidence rule does not prevent a party whose name appears upon a note to show that his signature was procured through fraud, accident or mistake. *Brewster* v. *Brewster,* 38 *N. J. L.* 119; *Naumberg* v. *Young,* 44 *Id.* 331. For the reasons just given, the contention that the evidence of the defendants and of Joseph B. Allen was immaterial, irrelevant and incompetent, is without merit.

Part II complains that plaintiff's counsel, in his opening to the jury, was improperly restricted by the court. In the very beginning of his opening he said to the jury, "you are being ask to try two cases, which are two of about ten or twelve different cases, similar in nature, arising——" He was stopped, and properly stopped, by objection; and he, sensibly, took no exception. Why he takes it now is hard to understand. Counsel for plaintiff wanted to read as part of his opening an affidavit which allegedly had been made by one of the defendants, and the trial judge in his discretion would not permit it as part of the opening. In this the trial judge was right.

Objection is raised to the refusal of the trial judge to permit Ellis H. Platt, a federal government investigator, from giving his opinion. A reading of the testimony of this witness shows that he was given extreme latitude in the giving of his testimony, and was prevented only from theorizing and speculating as to deductions that might be drawn from the books of the bank. There was no exception taken by plaintiff as to any direction made by the judge in relation to Platt's testimony; not even when the judge struck out his testimony as to the contents of the sheet of the bank's daily settlement book showing the transactions of November 17th, 1928—thirteen days before the face date of the Payne notes. This striking out was justified.

Parts III and IV relate to the court's charge, and Part V

to the court's refusal to direct a verdict in favor of the plaintiff. A reading of the charge shows that it was favorable to the plaintiff; a close analysis of the objections raised by the plaintiff is not required as there should have been a direction of verdicts for the defendants. In this case the question of consideration was one of law and not of fact. *Gladkin* v. *Ruby*, 103 *N. J. L.* 449. Though fully realizing the presumptions which follow the fact that the notes "were complete and regular on their face" when, about April 12th, 1929, for the first time, the notes came to the knowledge of the bank; yet, from the undisputed facts in the case, it is conclusive the bank did not hold these notes as a holder in due course; the bank never "took these notes in good faith and for value."

The Negotiable Instruments law (3 *Comp. Stat., p.* 3738, § 25) declares that "value" means valuable consideration; it further defines value as any consideration sufficient to support a simple contract. To give a consideration value for the supporting of a promise, it must be such as deprived the person to whom the promise was made of a right which he before possessed, or else conferred upon the other party a benefit which he could not otherwise have had. *Conover* v. *Stillwell*, 34 *N. J. L.* 54. There was no right which the plaintiff bank possessed before the notes were used by Kirkbride that the bank was deprived of by his use of the notes; and, there was no benefit conferred upon the Paynes by these notes or by the use that was made of them.

Since the Paynes were entitled to the judgments below, the judgments below are sustained.

*For affirmance*—The Chief Justice, Trenchard, Parker, Campbell, Lloyd, Case, Bodine, Daly, Donges, Van Buskirk, Kays, Hetfield, Dear, Wells, JJ. 14.

*For reversal*—None.